[No. 85810-1.   En Banc.]
Argued November 10, 2011.   Decided May 3, 2012.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT IN

CHAD MINNICK ET AL., *Appellants*, v. CLEARWIRE US LLC
ET AL., *Appellees*.

444

*Felix G. Luna* (of *Peterson Wampold Rosato Luna Knopp*) (*Jonathan Tycko* and *Melanie J. Williamson* of *Tycko & Zavareei LLP*, of counsel), for appellants.

*Kenneth E. Payson*, *Stephen M. Rummage*, and *Rebecca J. Francis* (of *Davis Wright Tremaine LLP*), for appellees.

*Mark A. Griffin* and *Sean Donahue* on behalf of National Consumers League, amicus curiae.

*Kathleen M. O'Sullivan*, *Elvira Castillo*, *Seamus C. Duffy*, *Susan M. Roach*, and *Katie L. Bailey* on behalf of CTIA-The Wireless Association, amicus curiae.

¶1 OWENS, J. — The United States Court of Appeals for the Ninth Circuit certified the following question:

> Does Washington law treat the [early termination fee] at issue in this case as an alternative performance provision, or as a liquidated damages clause?

*Minnick v. Clearwire US LLC*, 636 F.3d 534, 538 (9th Cir. 2011) (hereinafter Order). This question is important because a liquidated damages provision is subject to a penalty analysis that an alternative performance provision avoids. The early termination fee (ETF) is a provision in a fixed-term telecommunications contract that charges customers a fee for terminating their contracts prematurely. Because the ETF, at the time of contracting, provided customers with a "real option" and was of relatively equal value with the alternative option of fulfilling the contract, we hold that it is an alternative performance provision and not a liquidated damages clause.

## FACTS AND PROCEDURAL HISTORY

¶2 Clearwire provided wireless Internet and telephone services to the 12 subscribers (Appellants) who brought this case. Clearwire allows its users to access the Internet at broadband speeds from anywhere in the Clearwire coverage area simply by plugging in a wireless modem.

¶3 When signing up for this service, Clearwire's customers can choose between a month-to-month contract with no obligations beyond the monthly subscription charge and a fixed-term contract that has a discounted monthly subscription charge. Appellants all chose the fixed-term contract, for either one or two years. Those contracts allowed Appellants to cancel their subscription early by paying an ETF. The amount of the ETF varied depending on when the customer signed up and on whether the customer selected a one- or two-year contract. For customers who signed up before March 7, 2007, Clearwire charged a flat ETF of $180. For customers who signed up on or after March 7, 2007,

Clearwire charged a diminishing ETF. The ETF started at $220 and was reduced by $5 for each month thereafter under a two-year contract or $10 for each month under a one-year contract. As for customers under the " 'Clear' " brand (as opposed to the " 'Clearwire' " brand), the ETF was $120 less $4 for each month thereafter. *Id.* at 535.

¶4 Consequently, depending on how much time is left on the contract, canceling early may cost more or less than the sum of the remaining monthly payments. Under the $120 ETF, the customer always saves more money by canceling early because the ETF is always less than the sum of the remaining monthly payments. For the $220 ETF that decreases by $5 a month, the ETF is greater than the remaining payments only in the last three months. The $180 flat ETF is greater than the remaining payments only during the last four months.

¶5 Appellants are all customers who either incurred this ETF for canceling early or were threatened with this ETF for attempting to cancel early. For example, Chad Minnick incurred the ETF after informing Clearwire that he was canceling his subscription early. Similarly, Donald Schultz initially tried to cancel his service but refrained upon learning he would be responsible for the ETF. Eventually, Schultz canceled anyway and paid the ETF when he moved outside of Clearwire's coverage area. In any event, all Appellants were dissatisfied with Clearwire's service, alleging that instead of the fast and reliable service promised, they received inconsistent and painstakingly slow speeds.

¶6 Minnick sued Clearwire in King County Superior Court in April 2009, claiming that Clearwire was committing false advertising and was imposing ETFs unlawfully. He then filed the first amended complaint in May, which added the other 11 plaintiffs through class certification. In July, Clearwire removed the case to the United States District Court for the Western District of Washington where it filed a motion to dismiss all of Appellants' claims. The district court granted Clearwire's motion.

448

¶7 Appellants then appealed to the United States Court of Appeals for the Ninth Circuit, arguing that the ETF was a liquidated damages provision and not an alternative performance provision as the trial court found. The Ninth Circuit believed the case involved an unsettled area of state law and certified the following question to this court: "Does Washington law treat the ETF at issue in this case as an alternative performance provision, or as a liquidated damages clause?" Order at 538.[1]

¶8 We accepted the certified question pursuant to the Federal Court Local Law Certificate Procedure Act, chapter 2.60 RCW, and RAP 16.16.

## ISSUE PRESENTED

¶9 Is Clearwire's ETF an alternative performance provision or a liquidated damages provision subject to a penalty analysis?

## ANALYSIS

### A. *Standard of Review*

■ ■ ¶10 "The decision whether to answer a certified question pursuant to chapter 2.60 RCW is within the discretion of the court." *Broad v. Mannesmann Anlagenbau, AG*, 141 Wn.2d 670, 676, 10 P.3d 371 (2000). This court treats the certified question as a pure question of law and reviews it de novo. *See, e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 149 Wn.2d 660, 670, 72 P.3d 151 (2003).

### B. *The ETF Is an Alternative Performance Provision*

¶11 To determine whether the ETF is an alternative performance provision or a liquidated damages provision, we first analyze the issue under Washington law. However,

---

[1] It is worth noting that while Appellants spend a portion of their brief alleging fraudulent business practices by Clearwire, that issue is not before this court.

because Washington case law has not specifically addressed ETFs in this context, *see Chandler v. Doran Co.*, 44 Wn.2d 396, 267 P.2d 907 (1954); *Bellevue Sch. Dist. No. 405 v. Bentley*, 38 Wn. App. 152, 684 P.2d 793 (1984), we compare our analysis with that of other jurisdictions that have. Finally, we briefly address Appellants' argument that an alternative performance provision allows the promisee to recover only the option that results in the smallest recovery.

### i. The ETF Is an Alternative Performance Provision under Washington Law

¶12 An alternative contract allows a promisor to render " 'one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for . . . exchange for the [other party's] return performance.' " *Chandler*, 44 Wn.2d at 401 (quoting 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1079, at 379 (1951)). By comparison, a liquidated damages provision is a sum of money agreed upon in advance that is a reasonable forecast of just compensation for the harm caused by breach. *Walter Implement, Inc. v. Focht*, 107 Wn.2d 553, 559, 730 P.2d 1340 (1987). If the liquidated damages provision is not a reasonable forecast or if the harm is easy to ascertain, then the provision is an unlawful penalty. *Id.* Whether a contract provides for alternative performance or for liquidated damages is a question of factual interpretation that does not rely upon the form of words used by the parties. *Bentley*, 38 Wn. App. at 155. The distinguishing factor between the provisions is that the parties intended the options to give the promisor a real choice between reasonably equivalent choices. *Chandler*, 44 Wn.2d at 401.

¶13 This means that at the time fixed for performance, either alternative might prove more desirable and that the parties did not intend the "device to assure the performance of the [other] option." *Id.* at 401, 403. Additional factors to consider are "whether the money payment is equivalent to performance of the option, and the relative values of the

performances." *Bentley*, 38 Wn. App. at 156. The value of the options is determined at the time of contracting and not at the time the option is exercised. *Id.* In other words, whether a contract provides for an alternative performance or for a liquidated damages provision depends on whether (a) the contract gives the promisor a "real option" and (b) there is a reasonable equivalence between the two choices.

¶14 Appellants reject this analytical framework, claiming that a true alternative performance contract would allow Appellants to choose between paying (1) the monthly payments and receiving Clearwire's services for the life of the fixed term or (2) the ETF and receiving Clearwire's services for the life of the fixed term. This is incorrect and is not supported by case law. So long as the ETF is a " 'specified payment' " that either nullifies the contract or allows Appellants to " 'regain the legal privilege of not' " performing, then an alternative contract can exist. *Chandler*, 44 Wn.2d at 402 (quoting 5 CORBIN, *supra*, § 1213, at 883, 884; *Bentley*, 38 Wn. App. at 155-56 (same). Thus, despite Appellants' claims otherwise, the framework established in *Chandler* and *Bentley* applies here.

¶15 Under the Washington framework, the ETF at issue is an alternative performance provision and not a liquidated damages provision because the ETF provides a real option to Appellants and there is a reasonable equivalence between the two choices.

¶16 Here, a "real option" exists because at the time of contracting, Appellants did not know whether they would want to honor the contract for the fixed term or cancel early. A real option exists if either option might prove more desirable and the promisor is free to choose either one. *Chandler*, 44 Wn.2d at 401; *Bentley*, 38 Wn. App. at 155. At issue in *Bentley* was a collective bargaining agreement between a teacher and her school. *Bentley*, 38 Wn. App. at 154. Under the agreement, Bentley received paid sabbatical leave but had to repay the sabbatical funds if she chose not to return to work afterward. *Id.* The parties disputed

whether this requirement was a liquidated damages provision or an alternative performance provision. *Id.* at 154-55. The court held a real option existed because the teacher did not, at the time of contracting, know whether she would need or desire to return to her position. *Id.* at 156. More importantly, the school could not compel Bentley to choose either option. *Id.* Thus, rather than coerce Bentley into returning to her job, the agreement gave her control over her future plans by not requiring her to return. *Id.* Similarly in *Chandler*, a real option existed because the defendant had the power to choose between the two choices. 44 Wn.2d at 403. The defendant corporation had agreed to either sell plaintiff property or pay plaintiff additional salary. *Id.* at 398. The defendant argued that the option of an increased salary was merely a device to enforce the property sale. *Id.* at 403. However, the court held that the agreement gave a real option because the defendant reserved for itself the ability to choose between paying the increased salary or selling the property, depending on which one it preferred. *Id.*

¶17 Here, Appellants contracted with Clearwire to pay monthly fees for a fixed term in exchange for Clearwire's services at a discounted monthly price. Appellants had the option of canceling their contracts early if they paid the ETF. Similar to the teacher's position in *Bentley*, Appellants did not know whether they would want to continue the service in six months or in one year. As such, Appellants occupied a position similar to the defendant in *Chandler* and the teacher in *Bentley* who could choose between options. Appellants had a real option of exiting the contract early by paying the ETF if they so chose. Perhaps most importantly, Clearwire, like the school in *Bentley*, could not compel Appellants to choose either option.

¶18 Appellants counter that, unlike the school in *Bentley*, Clearwire can impose the ETF on the promisor in some situations. Clearwire, in fact, can force a customer to pay the ETF if the customer breaches the contract. How-

ever, Appellants' contention argues a scenario not before this court because Clearwire did not impose the ETF on any plaintiff for breach of contract. Rather, the only ETFs charged were for canceling the contract early, a contingency provided for in the contract allowing a customer to regain their freedom from performance. Thus, the question before us is not whether the ETF is a liquidated damage if unilaterally imposed upon Appellants, but whether the ETF is a liquidated damage when charged for canceling the contract.

¶19 Another issue the Appellants raise is the apparent lack of negotiations between the parties. In *Chandler*, 44 Wn.2d at 403, the parties had conducted extensive negotiations while, here, Appellants signed a form contract on line. Regardless, Appellants had an initial option between a month-to-month contract and a fixed-term contract. Further, negotiations are not always significant to the analysis as illustrated by *Bentley*, which did not consider them. 38 Wn. App. at 154-56. Thus, even though extensive negotiations did not occur, Appellants still chose the fixed-term contract with the ETF over an alternative month-to-month contract. The lack of negotiations does not detract from the real option that existed between the two options.

¶20 Moreover, it is conceivable that even if these contracts were negotiated one at a time, customers would still negotiate for an ETF. A customer signing up for a year-long (or two-year-long) commitment might be hesitant without having an escape from performance. The ETF provides that escape. It allows customers to enjoy a discounted monthly premium—due to signing up for a long-term plan—while retaining some of the flexibility that existed with the month-to-month plan.

¶21 Next, this court must determine if there exists a reasonable equivalence between the two options: paying the ETF or continuing the contract. The court must look to the relative value of the options at the time of contracting to determine if a reasonable equivalence exists. *Id.* at 155-56;

*Chandler*, 44 Wn.2d at 403-04; RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. c (1981) ("In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive."). If the values are "so disproportionate as to be unequal," then one option is a penalty and not an alternative performance. *Chandler*, 44 Wn.2d at 404. Both *Bentley* and *Chandler* analyze the relative value of options using a fairly deferential lens. In *Bentley*, the court held that a reasonable equivalence existed between the teacher returning to work or returning the sabbatical pay instead. 38 Wn. App. at 156. Bentley claimed the values were unequal because no reasonable person would choose unemployment. *Id.* However, at the time of contracting, a teacher may want to retain control over her future plans and not return to work. *Id.* Similarly, in *Chandler*, the court was unwilling to declare the option between the property and additional salary unequal because there was no vast disproportionality between them. 44 Wn.2d at 404. In other words, because there was a lack of obvious inequality between the two options, the relative values of the two options supported finding an alternative performance provision. *See id.* at 403-04.

¶22 We must determine the relative value of the ETF's three different values compared to the value of fulfilling the contract. Following the reasoning of *Bentley*, where the court looked to the relative value between the options at the time of contracting, the options here are relatively equal. As stated above, the value of the ETF compared to the sum of the remaining monthly payments generally depended upon the time left under the contract. Under the two-year contract, most disfavorable to the customer, the ETF is greater than the remaining payments only during the last four months.

¶23 The ETF benefited Appellants by allowing them to retain control over their future decision making while enjoying Clearwire's services at a discount, much like the teacher's option to not return to work gave her flexibility. As

for the few months where the ETF is greater than the remaining payments, the court's reasoning in *Chandler*—that so long as obvious inequality does not exist, the relative values are equal—is instructive. The ETF is significantly less than the remaining payments for the majority of the life of the contract. Put differently, a customer at the time of contracting could see value in canceling early and paying the ETF rather than paying the remaining monthly payments.

¶24 Even when the ETF is greater, it is not so vastly unequal to the remaining payments as to render it a liquidated damages provision. Under the most disadvantageous circumstances, a customer would have to pay a $180 ETF even though a single monthly payment of either $36.99 or $29.99 remained. Br. of Def./Appellee Clearwire US, LLC, App. A. This disparity between the ETF and the remaining payment may seem great, but taken in context of the entire two-year contract, the disparity lessens. Specifically, for the first 20 months of that contract the $180 ETF is less than the remaining payments. *Id.* In sum, the relative equivalence between the two options is such that a customer, at the time of contracting, could foresee utilizing the ETF to escape his or her obligation of monthly payments. Therefore, the ETF is an alternative performance provision and not a liquidated damages provision.

### ii. Holding that the ETF Is an Alternative Performance Provision Is Supported by Other Jurisdictions

¶25 The ETF is an alternative performance provision because it provides a real option to Appellants and is of relatively equal value to the alternative option of fulfilling the contract. This result is consistent with two other federal cases from California, which have specifically addressed whether ETFs are liquidated damage provisions or alternative performance provisions. On the other hand, this result is contrary to a few cases, including a California Court of

Appeal case, which was decided after the two federal cases. We address the cases that favor ETFs as alternative performance provisions first.

¶26 The two federal cases from California support our holding that the ETF is an alternative performance provision because the cases involve similar facts and reasoning. The most closely related case is *Hutchison v. AT&T Internet Services, Inc.*, No. CV07-3674 SVW (JCX), 2009 WL 1726344, 2009 U.S. Dist. LEXIS 53937 (C.D. Cal. May 5, 2009) (unpublished), *aff'd sub nom. Hutchison v. Yahoo! Inc.*, 396 F. App'x 331, 2010 WL 3706571 (9th Cir. Sept. 20, 2010) (unpublished), because it also involved an ETF that eventually became more expensive than fulfilling the contract. The ETF there was less than the remaining payments for the first seven months, at which point fulfilling the contract was cheaper than paying the ETF. *Hutchinson*, 2009 WL 1726344, at *6, 2009 U.S. Dist. LEXIS 53937, at *16. Because the court examined whether the ETF was a rational choice at the time of contracting, the fact that the ETF was more expensive after seven months was irrelevant. *Id.* The other federal court case from California reached a similar result. *Schneider v. Verizon Internet Servs., Inc.*, 400 F. App'x 136, 2010 WL 3825502, 2010 U.S. App. LEXIS 19974 (9th Cir. Sept. 27, 2010) (unpublished) (holding the ETF was an alternative performance provision under similar reasoning).

¶27 In contrast, other cases cited by Appellants reach a different result. Appellants mainly rely upon a California State Court of Appeal case, *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 122 Cal. Rptr. 3d 726, *cert. denied*, 132 S. Ct. 555 (2011), and a federal district court case from Illinois, *Mau v. L.A. Fitness Int'l, LLC*, 749 F. Supp. 2d 845 (N.D. Ill. 2010). Appellants incorrectly claim both *Hutchison* and *Schneider* are no longer good law because they were decided before *Cellphone Termination Fee Cases*, which held an ETF was a liquidated damages provision and not an alternative performance provision.

193 Cal. App. 4th at 329. Appellants mischaracterize that court's holding and wish to expand it so that all ETFs are liquidated damages. That court did not declare *Hutchison* bad law or that all ETFs are liquidated damages. *Id.* ("While [*Hutchison*] is not binding on this court . . . , it is self-evident that in contrast we deal here with contrary factual findings made after trial on a full evidentiary record.").

¶28 Instead, the court held that the ETF at issue was a liquidated damages provision on facts distinguishable from this case. Primarily, the defendant, Sprint, involuntarily imposed an ETF on some customers thereby depriving them of a rational choice between options. *Id.* at 328. The court found that of the customers charged an ETF, 80 percent were terminated by Sprint before being charged. *Id.* In comparison, Clearwire never declared a contract in breach before imposing the ETF. This is an important factual distinction because it demonstrates that Clearwire was not treating the ETF like a liquidated damages provision, which is imposed only upon breach. *See, e.g., Walter Implement*, 107 Wn.2d at 559 ("[T]he [sum of money] must be a reasonable forecast of just compensation for the harm that is caused by the breach.").

¶29 The second case, *Mau*, is also unpersuasive because it adopts a test that excludes a whole category of alternative performance provisions: those that provide for payment to "'regain the legal privilege of not rendering the promised performance.'" *Chandler*, 44 Wn.2d at 402 (quoting 5 CORBIN, *supra*, § 1213, at 883, 884). *Mau* ignores this type of provision and applies the penalty analysis to any provision that terminates the contract. 749 F. Supp. 2d at 847-48. In *Mau*, a plaintiff wished to cancel his gym membership but would have had to pay 50 percent of the remaining balance on his contract if he voluntarily terminated the contract. *Id.* at 847. The court applied a penalty analysis because the provision terminated the contractual relationship. *Id.* at 848 ("[T]here was and is no expectation of a continuing

relationship between [the parties]. [The plaintiff] simply wanted to end his contract."). However, *Mau's* reasoning is not persuasive because it did not apply an alternative performance analysis ("real option" and "reasonably related options") to reach its holding, and its proposed rule would exclude an entire class of potential alternative performance provisions.

¶30 Because *Cellphone Termination Fee Cases* relies on distinguishable facts and *Mau* applies a different legal standard, neither is persuasive. Accordingly, neither case impacts our conclusion that the ETF provision is an alternative performance provision and not a liquidated damages provision. This is not to say that if faced with similar facts as those in *Cellphone Termination Fee Cases*, we might not hold otherwise.

> ### iii. *Clearwire May Still Charge Customers the ETF Even if It Is More Expensive than the Remaining Monthly Payments*

¶31 Finally, Appellants argue that even if the ETF is a form of alternative performance, Clearwire is unable to enforce it. The crux of their argument is that the promisee of an alternative performance contract may recover only "damages flowing from the alternative 'resulting in the smallest recovery.' RESTATEMENT . . . OF CONTRACTS § 344 [(1932)]." Opening Br. of Appellant at 34. This is incorrect.

¶32 As the United States Court of Appeals for the Second Circuit stated, "Even if this is currently the rule—and its absence from the Second Restatement of Contracts suggests that it is not—it does not appear to apply in a case such as this one." *Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 34 (2d Cir. 2005). In an alternative contract where one of the alternatives is a sum of money, the promisee is entitled to the sum of money even though the other alternative may be less onerous to the promisor. *Id.* (quoting 25 RICHARD A. LORD, WILLISTON ON CONTRACTS § 66:106, at 120-21 (4th ed. 2002)). Therefore,

Clearwire can charge the ETF even though it might be more expensive than the amount remaining under the contract.[2]

## CONCLUSION

¶33 Under Washington law, an alternative performance provision is distinguishable from a liquidated damages provision because it provides a "real option" to the promisor and the alternatives are reasonably equal to each other. Here, the ETF provided a "real option" at the time of contracting because Appellants wanted to retain the control and flexibility that the early cancellation allowed them. Further, the ETF was less expensive than the remaining payments for the majority of the contract's life, thereby indicating the options were reasonably related. The ETF also allowed Appellants to benefit from reduced monthly premiums under the fixed-term contract but also enjoy some of the flexibility of the month-to-month subscription. Therefore, the ETF is an alternative performance provision that is not subject to a penalty analysis.

MADSEN, C.J.; FAIRHURST and J.M. JOHNSON, JJ.; and ALEXANDER, J. PRO TEM., concur.

¶34 CHAMBERS, J. (dissenting) — The fundamental difference between liquidated damages and an alternative performance provision is that an alternative performance is intended by the parties—both parties—to be a real choice, while a liquidated damages provision is meant to be a device to ensure performance. Clearwire's contract is an adhesion contract "signed" on line by its customers clicking a "yes" button. Clearwire asks us to believe that the fee it imposes on those who want out of the contract (or who breach the contract) is not intended as a device to ensure

---

[2] Appellants request that we apply a penalty analysis even if the ETF is an alternative performance provision. We decline.

performance. With all due respect to my learned colleagues of the majority, the majority comes to an erroneous conclusion because it frames the issue wrongly. The majority states, "Here, a 'real option' exists because at the time of contracting, Appellants did not know whether they would want to honor the contract for the fixed term or cancel early." Majority at 450. Thus, the majority concludes there was a choice between performing the contract and paying the early termination fee. If that were the correct way of examining the issue, contracting parties could always be said to have a choice between performance or canceling and paying a fee, and no early termination fee would ever be liquidated damages. Because I would hold that the early termination fees in this case are liquidated damages, not an alternative performance option, I dissent.

## FACTS

¶35 Clearwire is an Internet service provider. When customers sign up with Clearwire, they may choose month-to-month service or they may contract for a year or more. If customers choose a year or more, they agree to pay a monthly fee for the entire term of the contract. These contracts also contain a provision called an early termination fee (ETF). Under the contract, the ETF must be paid by customers who wish to terminate their service before the contract period expires. Depending on the particular contract the customer signed, the ETFs at issue here come in three basic varieties: a flat $180 ETF, a diminishing $220 ETF, and a diminishing $120 ETF. The $180 ETF is greater than the remaining payments on the contract for the last four months of the contract term. The $220 ETF is greater that the remaining payments for the last three months. The $120 ETF is never greater than the remaining monthly

payments. Clearwire may also demand the ETF upon a material breach by the customer.[3]

¶36 In a class action currently before the Ninth Circuit Court of Appeals, Clearwire customers assert that the ETF provisions in Clearwire's contracts are liquidated damages provisions. Such provisions are subject to a penalty analysis to determine whether the ETFs are in fact illegal penalties. Clearwire counters that the ETFs are alternative performance provisions, which are not subject to an illegal penalty analysis. The Ninth Circuit has certified the question to this court.

## ANALYSIS

### A. Liquidated Damages and Alternative Performance Provisions

¶37 Only one case from this court addresses alternative performance provisions. *Chandler v. Doran Co.*, 44 Wn.2d 396, 267 P.2d 907 (1954).[4] There, a company hired a manager, Benson Chandler, to operate one of its plants in Oakland, California. *Id.* at 398. In exchange for his services,

---

[3] We did not receive a record apart from briefs in this case. However, according to the appellants' brief, the $180 ETF clause stated:

"If your Internet Access Service was activated with a contract term prior to March 1, 2007 and you terminate that Service for any reason, including relocation outside a coverage area, or **that Service is terminated by Clearwire for any violation by you of the Agreement prior to the end of the Initial Term or any Renewal Term, as applicable, you will be liable for an early termination fee of $180.**"

Opening Br. of Appellant at 14 (emphasis in original) (quoting exhibit A to complaint). This language is undisputed, as is the claim that Clearwire may demand any of the ETFs upon material breach by the customer.

[4] One case from the Court of Appeals has also addressed the issue. *Bellevue Sch. Dist. No. 405 v. Bentley*, 38 Wn. App. 152, 684 P.2d 793 (1984). There, a teacher's contract provided for a paid sabbatical in exchange for either (a) returning to work for two years afterward or (b) repaying the salary paid during sabbatical. *Id.* at 156. The court noted that the teacher was presented with a real choice because she may not have known at the time of contracting whether she wanted to return to her job or not. *Id.* It also asserted that the two options were reasonably related. *Id.* Based on these two observations, it upheld the repayment provision as a true alternative. *Id.* The Court of Appeals' analysis is less than thorough and does not offer any particular insight into how the present case should be resolved.

Chandler received a salary and an option to buy the Oakland plant. But the contract gave the company a choice—if Chandler exercised his option, the company could (a) sell the property or (b) pay Chandler more money. *Id.*

¶38 The twist in the case was that the contract was an oral contract, and so the option was in fact unenforceable. *Id.* at 400, 402-03. When Chandler tried to exercise his option, the company refused, presumably noting that the option was unenforceable. *Id.* at 399. When he tried to get the money they agreed he would receive if the company chose not to sell, the company claimed that part of the agreement was a liquidated damages provision on an unenforceable option and so also not enforceable. *Id.* at 402-03. Chandler argued that " 'where a contract contains two promises in the alternative, one of which is within the Statute of Frauds and one of which is not, recovery may be had for breach of that which is not.' " *Id.* at 400 (quoting Appellant's Br. at 26). We held that the agreement for payment of money was enforceable as an alternative promise. *Id.* at 403. This holding obviously avoided an extremely unjust result.

¶39 In fleshing out the concept of an alternative performance provision, or alternative contract, as opposed to liquidated damages, we relied entirely upon the famous contract treatises of Corbin and Williston. We defined an alternative contract as " 'one in which a party promises to render some one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party.' " *Id.* at 401 (quoting 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1079, at 379 (1951)). We noted that distinguishing the two kinds of provisions is "a problem which the text writers seem to agree is puzzling, and upon which the decided cases are in conflict. It must be solved as a question of factual interpretation, and the form of words used by the parties is not controlling." *Id.* We continued:

"A contract may give an option to one or both parties either to perform a specified act or to make a payment; and though this form of contract cannot be used as a cover for the enforcement of a penalty, yet if on a true interpretation it appears that it was intended to give a real option (that is, that it was conceived possible that at the time fixed for performance, either alternative might prove the more desirable), the contract will be enforced according to its terms. The fact that a promise is expressed in the alternative, however, may easily be given too much weight. As the question of liquidated damages or penalty is based on equitable principles, it cannot depend on the form of the transaction, but rather on its substance. It follows that a contract expressed to be in the alternative when examined in the light of the existing facts may prove to be (1) a contract contemplating a single definite performance with a penalty stated as an alternative, (2) a contract contemplating a single definite performance with a sum named as liquidated damages as an alternative, or (3) a contract by which either alternative may prove the more advantageous and is as open to the promisor as the other. A contract may belong to the third class even though the term 'liquidated damages' is applied in the contract to one alternative. But the fact that a contract appears from its terms to belong to the third class does not prove that it does not belong to the first."

*Id.* at 401-02 (quoting 3 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 781, at 2194 (rev. ed. 1936)).

¶40 Finally, we pointed out that the lengthy negotiations and the magnitude of the transaction were such that a decision could not have been reached by the parties "without thorough study." *Id.* at 403. This, combined with the fact that we could not "say that the relative values of the alternatives are so disproportionate as to be unequal," convinced us that the contract contained an alternative performance provision. *Id.* at 404.

## B. *Clearwire's ETFs Are Liquidated Damages*

¶41 Applying the principles stated in *Chandler* and the treatises upon which it relies, I would hold the ETF provi-

sions in this case are more like liquidated damages than an alternative performance option. First, the contract allows the same ETF to be imposed unilaterally by Clearwire upon either termination of the contract by the customer or breach by the customer. A fee imposed upon breach is by definition a liquidated damages provision. 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 65:7, at 263 (4th ed. 2002) ("a liquidated damages provision provides for an agreed result to follow from nonperformance"). Clearwire wants it both ways; when challenged by a customer, the ETFs are alternative performance provisions, but when imposed by Clearwire for breach, they are liquidated damages.

¶42 The problem is not solved by Clearwire's argument that it did not impose an ETF for breach in this particular case. Br. of Def./Appellee Clearwire US LLC at 36-39. Given that our goal is to determine whether Clearwire's contract contains a true alternative promise, examining the actual terms of the contract is the best way to determine the true nature of the ETF. Under the actual terms of the contract, the ETF can be imposed unilaterally by Clearwire upon a breach of the contract; this fact tips the scales heavily toward liquidated damages.

¶43 Second, when both alleged "alternative performances" in a contract are the payment of money and one is a payment of a lump sum to escape further payments under the contract, common sense dictates that the lump sum is a liquidated damages provision. There is no meaningful difference between a customer "terminating" the contract and the customer simply ceasing to pay its agreed monthly payments, and thus breaching the contract. *See Mau v. L.A. Fitness Int'l, LLC*, 749 F. Supp. 2d 845, 849 (N.D. Ill. 2010) (holding that such a situation would "more fairly be classified as non-performance . . . rather than alternative performance"). In either instance, Clearwire would charge an ETF, and in either instance, the ETF is best classified as a liquidated damages provision.

¶44 Third, one of the defining characteristics that distinguishes alternative performance from liquidated damages is that "[i]n an alternative contract, either of two performances may be given by the promisor and received by the promisee as the agreed exchange for the return performance by the promisee." 24 WILLISTON & LORD, *supra*. This hews closely to the definition from Corbin we relied on in *Chandler*: " 'two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party.' " *Chandler*, 44 Wn.2d at 401 (quoting 5 CORBIN, *supra*). The ETFs in this case do not match either of these definitions. For one thing, the contracts are not mutually agreed upon in a bargained-for exchange. They are boiler plate adhesion contracts presented in take-it-or-leave-it form. More importantly, the alternatives are not given in exchange for a single return performance. The point of the "alternative" is that the promisor may choose which performance to give in exchange for the same consideration. *Id.* Clearwire's customers do not receive a year of service in exchange for either the ETF or their monthly payments. If customers end up paying the ETF, they get literally nothing in exchange.

¶45 Fourth, a true alternative performance "looks to a continuation of the relationship between the parties, rather than to its termination." 24 WILLISTON & LORD, *supra*. That is manifestly not the purpose of the ETFs in this case. The ETF is imposed upon termination of the relationship. That sounds more like a liquidated damages provision, which "provides for an agreed result to follow from nonperformance." *Id.*

¶46 Fifth, an alternative contract must present a real option; in other words, the values of the two performance options must be relatively equal. *Chandler*, 44 Wn.2d at 404. Contrary to Clearwire's assertions, the ETF is not relatively equal to the monthly payments. For several months, the ETF is more expensive than the remaining payments on the contract. We have said that a real option

exists where, " '*at the time fixed for performance*, either alternative might prove the more desirable.' " *Id.* at 401 (emphasis added) (quoting 3 WILLISTON, *supra*). In the last few months, the ETF can be significantly more expensive than the monthly payment, and thus at the time fixed for that performance, the ETF could never prove more desirable.

¶47 Moreover, there is a serious flaw in Clearwire's reasoning on this point. The ETF is not paid as an alternative in exchange for Clearwire's service. Instead, the customer pays the ETF and receives *no* Internet service in exchange. As discussed above, that alone should be enough to convince the court that this is not a true alternative contract. But it also skews the value calculations. A customer terminating the contract will have not only paid the monthly fee for Internet service up to the point of termination, but also the ETF. Under Clearwire's reasoning, a customer that cancels in the first month and pays the ETF is exercising a "real option" because the ETF is so much cheaper than the remaining payments. But it seems that the customer's "real option" in that instance results in paying both the monthly fee and the ETF (around $220) for one month of Internet service.

¶48 It is true that some of the treatises use language suggesting that some alternative performance provisions can be "the agreed price of the privilege of not performing the promise." 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS: DAMAGES § 58:18, at 508 (rev. ed. 2005). But even then, an alternative performance "operates as the full performance by the promisor of the agreed exchange for what may have been promised in return." *Id.* at 509. Clearwire's ETFs are not true alternative performance provisions under this rubric.

¶49 Moreover, courts examining this question "must determine whether the parties *actually bargained* for an option. . . . If the clause was inserted *at the request of the party who wishes to discharge the contract by payment*, it is

likely that an option was intended." *Id.* at 505 (emphasis added) (footnote omitted). Our case law agrees with this assessment. In upholding the provision as an alternative one in *Chandler*, we said:

> From the pleading, it appears that the parties conducted lengthy negotiations before the oral agreement was reached. It also is apparent that the transaction was one of considerable magnitude, and of such a nature that a decision to buy or sell could not be reached by either of the parties without thorough study.

*Chandler*, 44 Wn.2d at 403. The sophistication of the parties and the thought that went into the contract was plainly an important factor in our one decision on alternative contracts.

¶50 The contract at issue here is of an entirely different character. It was written by Clearwire's attorneys and presented as a click-through contract on line. I urge the members of this court to consider the last time they clicked "I agree" on a software update. This is a similar contract of adhesion to which all users must agree.

¶51 Finally, the case law from other jurisdictions supports the claim that the ETFs are liquidated damages. *Mau* is a case nearly indistinguishable from this one, except that the contract was not a click-through, on-line contract. *Mau*, 749 F. Supp. 2d at 847. There, the court held a termination fee in a gym contract was not an alternative performance provision. *Id.* at 849. Its reasoning makes such sense in light of this case that it is worth quoting extensively:

> Fundamentally an alternative-performance analysis is conducted in response to the suggestion of an "attempt to disguise a provision for a penalty that purports to make payment of the amount an alternative performance under the contract" (RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. c (1981) (hereafter cited simply "cmt. c")). As *River E. [Plaza, LLC v. Variable Annuity Life Ins. Co.]*, 498 F.3d [718,] 722 [(7th Cir. 2007)], quoting cmt. c, says:

> [A] court will look to the substance of the agreement to determine whether . . . the parties have attempted to disguise a provision for a penalty that is unenforceable. . . . In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive.

Of course "the underlying question is whether [a] clause is punitive in nature" (*id.*). Courts should expect to find non-punitive forms of alternative performance clauses, as opposed to traditional liquidated damage clauses, where "the primary object of an alternative contract is performance, and it thus looks to a continuation of the relationship between the parties, rather than to its termination" (24 WILLISTON ON CONTRACTS § 65:7 (Richard Lord, ed., 4th ed. 2010)).

> This exposition of the alternative-performance analysis makes clear that such an analysis is not really applicable here. First, by definition there was and is no expectation of a continuing relationship between Mau and Fitness—exactly the opposite is true. Mau simply wanted to end his contract with Fitness and presumably find another place to work out, if he chooses to continue to do so.

> Surely the situation can more fairly be classified as nonperformance (indeed, nonperformance by Fitness rather than by Mau, when his version is credited as it must be on the current motion), rather than alternative performance.

*Id.* at 848-49 (some alterations in original). Here, assuming the facts most favorable to the parties appealing from the grant of a motion to dismiss, the situation is nearly identical, right down to the nonperformance being on the part of Clearwire rather than the appellants.[5]

¶52 In *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 122 Cal. Rptr. 3d 726, *cert. denied*, 132 S. Ct.

---

[5] This issue is lurking in the background of this case. The reason given by the customers-cum-plaintiffs in this case for canceling their contract with Clearwire is unreliable service. Opening Br. of Appellant at 15-19. They allege that when they tried to cancel their service because of its low quality—because of Clearwire's breach, in other words—they were charged an ETF for the privilege of canceling. *Id.*

555 (2011), the California Court of Appeal held that ETFs imposed by Sprint were not alternative performance provisions. It stated that Sprint adopted ETFs after studying "the concept of term contracts with ETFs as a means to reduce its [rate of customers discontinuing service], and tested use of ETFs in selected markets." *Id.* at 306 (footnote omitted).[6] The case had a different procedural posture than this one because the trial court had already held the ETFs were not an alternative performance provision and that finding was challenged on appeal. *Id.* at 329. It also had a somewhat different factual posture because Sprint had imposed the fees mostly as a response to actual breaches by customers. *Id.* at 328. Nevertheless, the court cited favorably the trial court's observations that "the ETF provisions 'did not give customers a rational choice of paying the ETF or completing the contract,' because the language of the ETF provision permitted Sprint to impose the fee on customers involuntarily." *Id.* (quoting the trial court).

¶53 The undisputed language in Clearwire's contracts permits Clearwire to impose the fee involuntarily. Just like Clearwire, Sprint argued that the value of the two options was relatively equal:

> Sprint argues that the trial court erred in judging the economic function of the ETF and choice it provided customers after the contract had either been performed or breached, and that it should instead have judged the choice the ETF provided customers at the outset of the contract. (*Blank v. Borden* . . . 11 Cal.3d 963, 971, 115 Cal.Rptr. 31, 524 P.2d 127 [(1974)] [arrangement viewed from the time of making the contract].) But, as Plaintiffs respond, *the service agreements provided from the inception of the contract that an ETF could be triggered involuntarily by Sprint, confirming that at the time of contracting the provision was not understood or intended as providing only for a "rational choice" of the customer.*

---

[6] We do not have a similar record indicating Clearwire's intent in this case. It is possible that its motives for imposing an ETF were entirely different from Sprint's.

*Id.* at 329 (emphasis added). Clearwire's contracts at the time of contracting also provided that Clearwire could unilaterally impose the ETF. It is no more plausible in this case that Clearwire's ETFs were understood as or intended to provide only for a rational choice.

## CONCLUSION

¶54 Clearwire's contracts of adhesion are completely dissimilar to the carefully and fully negotiated contract wherein we found an alternative performance provision over half a century ago. The fundamental question is whether the ETFs at issue here are intended by the parties to be a true alternative or a device to make it less likely a customer will terminate monthly payments. Under the law as it now stands, these ETFs are much more like liquidated damages than alternative performances. But even if it were a closer call, we should notice the facts that Clearwire unilaterally wrote the contract and that Clearwire may unilaterally impose the ETF under the terms of the contract. We may also safely assume Clearwire wants paying customers, not cancellations. If Clearwire wants a liquidated damages clause, it is welcome to include one. But that clause cannot impose an illegal penalty, and Clearwire should not be allowed to circumvent the protections a penalty analysis bestows on its customers. Because I would hold the ETFs at issue here are liquidated damages provisions subject to a penalty analysis, I dissent.

C. JOHNSON, STEPHENS, and WIGGINS, JJ., concur with CHAMBERS, J.