FILED
United States Court of Appeals
Tenth Circuit

May 16, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DIGITAL ALLY, INC.,

    Plaintiff-Counter
    Defendant-Cross Defendant -
    Appellant/Cross-Appellee,

v.

Z3 TECHNOLOGY, LLC,

    Defendant-Counterclaimant-Third
    Party Plaintiff - Appellee/Cross-
    Appellant.

Nos. 12-3258 & 12-3268

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:09–CV–02292–KGS)**

James F.B. Daniels of McDowell, Rice, Smith & Buchanan, Kansas City, Missouri, for Appellant/Cross-Appellee.

Mark E. Wilson (Meghan A. Welch and Jeremy D. Kerman with him on the briefs) of Kerns, Frost & Pearlman, LLC, Chicago, Illinois, for Appellee/Cross-Appellant.

Before **MATHESON, McKAY,** and **EBEL,** Circuit Judges.

**McKAY**, Circuit Judge.

This diversity case arises out of two contracts between the parties to this litigation.

Both parties have filed appeals, in which Appellant–Cross-Appellee Digital Ally mainly challenges the validity and enforceability of one of the contracts, while Appellee–Cross-Appellant $Z^3$ Technology challenges certain elements of the damages award.

## I.  Background

The contracts at issue in this case related to $Z^3$'s design and manufacturing of circuit board modules for use in Digital's products.  The first contract, signed in November 2008, called for $Z^3$ to design, manufacture, and deliver to Digital 1,000 modules incorporating Texas Instruments' DM355 computer chip.  The second contract, signed on January 2, 2009, involved a larger quantity of modules that would use Texas Instruments' next-generation DM365 chip.  Both contracts were signed by Robert Haler, who was then Digital's Executive Vice President of Engineering and Production.  The contracts were described as "Production License Agreement[s]," and they expressly provided that the modules would be licensed, not sold, to Digital.  (Appellant's App. at 39, 52.)  The contracts both stated they would "be governed by and interpreted in accordance with the laws of the State of Nebraska, without reference to conflict of laws principles."  (*Id.* at 43, 58.)

The 2008 contract called for Digital to make a total payment of $155,000 in exchange for $Z^3$'s design and delivery of the 1,000 DM355-based modules.  Digital paid the first $140,000 required by the contract, but it refused to make the final $15,000 payment.  Digital claimed that the DM355 modules provided by $Z^3$ had hardware and/or

software design flaws that resulted in "pink noise" and other problems.[1]  The jury

ultimately found that both parties had breached the contract, Digital by failing to pay the

final $15,000, and $Z^3$ by failing to satisfy the contract's hardware warranties.  The jury

awarded $15,000 to $Z^3$ for Digital's breach of its payment obligations, while it awarded

$30,000 to Digital for $Z^3$'s failure to satisfy the contract's hardware warranties.  On

appeal, the only issue we must consider regarding the 2008 contract is $Z^3$'s argument that

it was entitled to prejudgment interest on the $15,000 award.

The 2009 contract, which is the main subject of this appeal, was a somewhat more

complex contract than the 2008 contract.  Unlike the 2008 contract, this contract did not

simply call for a specific total payment in exchange for a specific number of modules.

Rather, the contract included various types of payments Digital would be required to

make at different points of the process.  First, after setting out a twenty-eight-week design

schedule, the contract listed a payment schedule for $300,000 in fees that were payable

during the design period.  Next, ¶ 14 of the contract—entitled "Guaranteed Minimum

Purchase Quantity or Minimum Royalty"—required Digital to fulfill several purchase

and/or royalty obligations at various times during the contract period.  (*Id.* at 62 (bolding

omitted).)  Specifically, the first subsection of ¶ 14 obligated Digital to make a minimum

purchase of fifty pre-production samples at a cost of $200 per unit.  Subsection (b)(ii) of ¶

14 then provided for an "initial production order (guaranteed) of 3,000 units @

---

[1] "Pink noise" refers here to a problem that "manifest[ed] as an intermittent colored spot on a video screen" during video playback.  (Appellant's App. at 1109.)

$100/unit." (*Id.* at 63 (capitalization omitted).)  Finally, subsection (b) of ¶ 14 included

the following terms:

> iii)  Minimum 12,000 units or equivalent Royalty PER YEAR for 3 years.
>> (1)  LICENSEE [Digital] will provide LICENSOR [$Z^3$] 1st opportunity to manufacture modules given LICENSOR's per module pricing, quality, and delivery are competitive with alternative manufacturers, including consideration of royalty cost for non-Z3 manufactured modules.
>> (2)  Module price ESTIMATED TARGET is $100/module assuming similar [printed circuit board] layer, component, and architecture to [the modules manufactured pursuant to the 2008 contract].  FINAL PER/MODULE PRICE WILL BE AGREED AFTER COMPLETION OF FINAL HARDWARE DESIGN AND SUBMISSION OF FINAL BOM [(BILL OF MATERIALS)] TO LICENSEE.  Specialized components may affect this pricing.  Pricing is reviewed between LICENSOR and LICENSEE every 90 days.  LICENSOR will provide LICENSEE 100% complete BOM for LICENSEE's use in cost analysis.  BOM must include all manufacturer names and manufacturer part numbers.
>> (3)  Production Payment Terms:  Net 30 days[.]
>> (4)  Production Lead Time:  estimated 10 weeks[.]
> iv)  If LICENSOR cannot provide on-time delivery, a price and quality acceptable to LICENSEE, or is not willing to produce [the DM365-based module], then LICENSEE has the right to use alternative manufacturing.  LICENSEE is liable for royalty of $7.50 per unit on modules actually SOLD BY LICENSEE on all modules not manufactured by Z3.  []If LICEN[S]EE does not order 36,000 units at 12,000 units per year, LICENSEE is [to] pay a minimum royalty to LICENSOR equivalent to $12,000*\$7.500 = \$90,000$ royalty per calendar year or the pro-rated balance if at least some units have been purchased within the fiscal year in question.  . . .

(*Id.* at 63.)

Initially, both parties began performing their various obligations under the

contract.  Digital paid the first two payments required under the payment schedule,

$75,000 in January 2009 and $50,000 in February 2009, and both sides spent time working on the module's design. However, in April 2009, Digital sent $Z^3$ a letter purporting to terminate the contract. It is undisputed that this letter did not comply with the contractual termination requirements, which included a notice-and-cure period. However, in accordance with Digital's letter, $Z^3$ stopped its design work on the DM365-based module. Accordingly, no DM365 modules were ever completed by $Z^3$.

After repudiating the 2009 contract, Digital filed a lawsuit in the Kansas district court seeking a declaration that the 2009 contract was validly rescinded or void because Executive Vice President Haler, the Digital officer who signed this contract, lacked the authority to do so as a result of a change in Digital's internal signature policies in December 2008. Digital also raised a claim based on the 2008 contract, alleging that $Z^3$ breached this contract by delivering faulty modules that did not satisfy the contractual warranties. $Z^3$ filed a counterclaim in which it alleged, among other things, that Digital breached both contracts by failing to pay the final $15,000 due on the 2008 contract and by repudiating and failing to fulfill its performance obligations under the 2009 contract.[2]

The district court resolved several legal issues relating to the 2009 contract in various summary judgment rulings. The district court concluded that the undisputed facts showed that (1) Vice President Haler had at least apparent authority to sign the contract,

---

[2] $Z^3$ also filed a third-party complaint against Vice President Haler. $Z^3$'s claims against Vice President Haler were ultimately settled outside of court, and they are not pertinent to this appeal.

(2) any failure on $Z^3$'s part to satisfy any conditions precedent was excused because Digital prevented $Z^3$'s performance, and (3) Digital breached the contract by its anticipatory repudiation. The district court then concluded that $Z^3$ was entitled as a matter of law to the remaining $175,000 of design fees that Digital had failed to pay under the payment schedule. As for the three-year minimum purchase or equivalent royalty provisions of ¶ 14(b)(iii) and (iv) of the contract, the district court rejected $Z^3$'s argument that it was entitled to lost profits for the minimum production orders of 12,000 units per year. The court concluded that this portion of the contract created an alternative contract under which Digital could perform its contractual obligations by either purchasing 12,000 units per year for three years or by paying the equivalent royalty of $90,000 per year. The court then concluded that $Z^3$'s damages were limited to the alternative that resulted in the lesser recovery—the $270,000 total royalty payment. The court thus concluded $Z^3$ was entitled as a matter of law to recover $270,000 for Digital's failure to comply with the purchase-or-royalty provisions of ¶ 14(b)(iii) and (iv). As for the earlier contractual provisions requiring Digital to purchase a minimum pre-production order of 50 units and an initial production order of 3,000 units, these provisions lacked a similar royalty alternative. Moreover, disputed facts regarding $Z^3$'s costs and overhead prevented the district court from resolving the question of $Z^3$'s lost profits for these 3,050 units as a matter of law. The district court accordingly denied summary judgment as to this element of damages, although it granted summary judgment on the question of breach.

Following a lengthy jury trial, the jury found $Z^3$ was entitled to an additional

$100,000 in damages for Digital's breach of the 2009 contract. The jury also found both parties had breached the 2008 contract, and it awarded $15,000 in damages to $Z^3$ and $30,000 in damages to Digital on their respective claims based on this contract.

$Z^3$ subsequently filed a motion asking the district court to award $Z^3$ prejudgment interest for its $15,000 award on the 2008 contract and for the $175,000 in design fees and $270,000 in royalties that the district court had concluded $Z^3$ was entitled to as a matter of law for Digital's breach of the 2009 contract. The district court denied this motion.

Digital then appealed, and $Z^3$ filed a cross-appeal. On appeal, Digital challenges the district court's summary judgment rulings regarding the validity and enforceability of the 2009 contract. Digital also argues the district court erred in allowing $Z^3$ to recover $100,000 in lost profits based on Digital's failure to purchase the minimum pre-production and initial production orders. In its cross-appeal, $Z^3$ argues the district court erred by interpreting ¶ 14(b)(iii) and (iv) as setting forth alternative performance obligations and by holding that $Z^3$ was only entitled to recover the $270,000 royalty and not its lost profits as damages for Digital's breach of these provisions. $Z^3$ further argues the district court erred in denying $Z^3$'s request for prejudgment interest.

## II. Digital's appeal

We first consider Digital's challenge to the district court's summary judgment rulings regarding the validity and enforceability of the 2009 contract. We review the district court's summary judgment decisions de novo, applying the same standard as the

-7-

district court. *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012). Under this standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree the substantive issues in this case are governed by Nebraska law based on the contracts' choice-of-law provisions.

Digital argues there are three reasons why the district court should have granted Digital's motion for summary judgment and denied $Z^3$'s motion for summary judgment on the parties' claims relating to the 2009 contract. First, Digital argues the contract is totally or at least partially unenforceable based on several unfulfilled conditions precedent. Second, Digital contends the contract was not binding on Digital because Vice President Haler lacked the authority to unilaterally sign contracts of this nature, due to a recently approved change in Digital's internal policies regarding its officers' authority to sign certain types of documents on behalf of the company. Third, Digital argues that $Z^3$ could not successfully bring an action on the 2009 contract because $Z^3$ failed to substantially perform its own obligations under the contract. We consider each of these arguments in turn.

## A. Purported Conditions Precedent

Digital argues the district court should have granted summary judgment in favor of Digital based on various unfulfilled conditions precedent. "The law of Nebraska is consistent with the recognized definitions which hold that a condition precedent is either a condition which must be performed before a contract becomes binding upon the parties

to it or must be fulfilled before a duty arises to perform the obligations of an already existing contract." *Omaha Pub. Power Dist. v. Emp'rs' Fire Ins. Co.*, 327 F.2d 912, 915 (8th Cir. 1964). Therefore, "[u]nder Nebraska law, 'where a contract is executed but its effectiveness or fulfillment is dependent upon the doing of an agreed-upon condition before it shall become a binding contract, such contract cannot be enforced unless the condition is performed.'" *AMISUB, Inc. v. Shalala*, 12 F.3d 840, 844 (8th Cir. 1994) (quoting *Metschke v. Marxsen*, 125 N.W.2d 684, 687 (Neb. 1964)). "However, it is equally true that a condition is excused if the occurrence of the condition is prevented by the party whose [contractual obligations are] dependent upon the condition." *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453, 457 (Neb. 1987). In other words, "if a promisor prevents or hinders the occurrence of a condition precedent, the condition is excused." *Id.*

In *Chadd*, as in this case, the breaching party in a contract case claimed the other party could not succeed on its breach of contract claim because of unfulfilled conditions precedent. The defendant in *Chadd*, Midwest Franchise Corp., argued the plaintiffs failed to fulfill several conditions precedent, since they "never submitted a bid as required, could not keep construction costs within the stated cost estimate, never attached a required addendum setting forth exact rental costs, and did not complete the building or deliver possession of such to Midwest for its acceptance." *Id.* at 458. Midwest argued that because its own duties to perform were premised on these conditions precedent, the nonoccurence of these conditions prevented the plaintiffs from succeeding on a breach of

contract claim against Midwest. In turn, the plaintiffs argued in part "that they were unable to ever satisfy these conditions precedent due to the appellee's repudiation of the contract." *Id.* While the Nebraska Supreme Court noted there was a factual dispute as to whether an anticipatory repudiation had occurred, it agreed with the plaintiffs' legal argument that the nonoccurrence of the conditions precedent would not bar their contract claim if Midwest had prevented the occurrence of these conditions by repudiating the contract. "In a case such as this where one party (Chadds) has not fulfilled certain conditions precedent to the other party's (Midwest's) duty to perform, a special rule of law applies. Where a party's repudiation contributes materially to the nonoccurrence of a condition of one of his duties, the nonoccurence is excused." *Id.*

On appeal, Digital suggests that *Chadd* has been limited by the Nebraska Supreme Court's subsequent statement in *Lee Sapp Leasing, Inc. v. Catholic Archbishop of Omaha*, 540 N.W.2d 101, 105 (Neb. 1995), that "[t]he nonoccurrence of a condition precedent cannot be excused if occurrence of the condition was a material part of the agreed exchange." However, the Nebraska Supreme Court made this statement in discussing a different rule under which a court may excuse the nonoccurrence of a condition to avoid a disproportionate forfeiture. Nothing about the court's discussion in *Lee Sapp* suggests that it was intended to affect the *Chadd* rule's reach, limiting *Chadd* to non-material conditions and thus allowing breaching parties to escape liability for their breach so long as they successfully prevented or hindered material conditions from occurring. We conclude that Nebraska courts would continue to apply the reasoning from

-10-

*Chadd* to hold that the nonoccurrence of a condition precedent is excused when the occurrence of the condition was prevented or hindered by the breaching party, regardless of whether this condition was material or not. After thoroughly reviewing the record and Digital's arguments on appeal, we also conclude that the nonoccurrence of any of the conditions precedent identified by Digital in this case resulted from Digital's unequivocal repudiation of the contract. Thus, the nonoccurence of any of these purported conditions precedent is excused and does not bar $Z^3$ from successfully pursuing a breach of contract claim against Digital.

Digital also raises the related argument that the purchase-or-royalty provisions in ¶ 14(b)(iii) and (iv) are unenforceable because these provisions gave only an estimated purchase price for the production modules and stated that the final price would not be agreed upon until after the final hardware design had been completed. Digital argues that the failure to state a specific price renders this provision unenforceable as a matter of law. For support, Digital cites to a case in which a Nebraska appellate court held that a contract was not enforceable at the time it was executed because it failed to define the quantity of goods to be sold under the contract, the price any goods would be sold for, or any type of method for determining the price. *MBH, Inc. v. John Otte Oil & Propane, Inc.*, 727 N.W.2d 238, 248 (Neb. App. 2007). We are not persuaded that this case bars $Z^3$'s recovery under ¶ 14(b)(iii) and (iv). In contrast to the contract at issue in *MBH*, the contract at issue in this case contained both a quantity and an estimated price for the goods. A purported contract will usually be considered "too indefinite to form a contract

if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy," *Stitch Ranch, LLC v. Double BJ Farms*, 837 N.W.2d 870, 883 (Neb. App. 2013), but "'the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon,'" *City of Scottsbluff v. Waste Connections of Neb.*, 809 N.W.2d 725, 740 (Neb. 2011) (quoting Restatement (Second) of Contracts § 33, cmt. a). Where a purported contract provides neither a quantity nor a price for the goods to be sold, as in *MBH*, the agreement is too indefinite to bind the parties absent other indications of the parties' intent. *See MBH*, 727 N.W.2d at 249 (noting that an unenforceable agreement "may become enforceable when the missing term is subsequently supplied by the parties"). In this case, however, the 2009 contract and the parties' actions demonstrated an intent to be bound, and the terms of the contract were sufficiently definite for a court both to determine whether a breach had occurred and to provide a remedy for the breach. Moreover, as we discuss in further detail below, we agree with the district court that the contract specified an alternative performance option—a minimum royalty of $7.50 per unit for the 36,000 modules Digital was otherwise obligated to purchase—that was not based in any way on the as-yet-unfinalized price for the modules, and we affirm the district court's decision to award damages based on this alternative. For both of these reasons, we reject Digital's argument that ¶ 14(b)(iii) and (iv) are too uncertain and indefinite to be enforced.

**B. Vice President Haler's Authority to Sign the Contract**

Next, Digital contends the 2009 contract was not binding on Digital because Vice President Haler's authority to enter into this type of contract had been limited by an internal change to Digital's policies in December 2008. However, we conclude that Vice President Haler clearly had at least apparent authority to sign the 2009 contract, and we thus need not resolve the dispute over whether Vice President Haler had actual authority to sign the contract on behalf of Digital.

The parties assume that Nevada law applies to the question of apparent authority, due to the fact that Digital is incorporated under the laws of Nevada, and we will accordingly proceed under the same assumption. *See Grynberg v. Total SA*, 538 F.3d 1336, 1346 (10th Cir. 2008) (applying Colorado law because the parties assumed Colorado law applied). Under Nevada law, "[a] party claiming apparent authority of an agent as a basis for contract formation must prove (1) that he subjectively believed that the agent had authority to act for the principal and (2) that his subjective belief in the agent's authority was objectively reasonable." *Great Am. Ins. Co. v. Gen. Builders*, 934 P.2d 257, 261 (Nev. 1997). In this case, Digital contests only the second prong of this test, arguing that Z[3]'s subjective belief in Vice President Haler's authority to sign the 2009 contract was not objectively reasonable because it was not based upon anything Digital had done.

As Digital notes, the Nevada Supreme Court "has repeatedly ruled that apparent authority (when in excess of actual authority) proceeds on the theory of equitable

-13-

estoppel; it is in effect an estoppel against the alleged principal to deny agency when by his conduct he has clothed the agent with apparent authority to act." *Tsouras v. Sw. Plumbing & Heating*, 587 P.2d 1321, 1323 (Nev. 1978) (internal quotation marks and brackets omitted). Accordingly, "'[i]t is indispensable to keep in mind here that, as against the principal, there can be reliance only upon what the principal himself has said or done, or at least said or done through some other and authorized agent.'" *Id.* (quoting *Ellis v. Nelson*, 233 P.2d 1072, 1076 (Nev. 1951)). The agent's acts alone are not sufficient to establish apparent authority; rather, if the agent's acts, rather than the principal's acts, are relied upon, there must be "'evidence of the principal's knowledge and acquiescence in them.'" *Id.* (quoting *Ellis*, 233 P.2d at 1076).

Digital argues there is no evidence in this case that Digital or one of its other agents did or said anything which would suggest that Vice President Haler had the authority to enter into the 2009 contract. Digital contends the only actions suggestive of authority were taken by Vice President Haler himself, and Digital argues that this was insufficient as a matter of law to establish apparent authority. However, we are persuaded that Digital's own actions established apparent authority. First, Digital took the action of bestowing upon Vice President Haler the title of Executive Vice President of Engineering and Production. This action in itself suggested that Vice President Haler might have the authority to enter into engineering and production contracts like the contracts at issue here. *See Bucher & Willis Consulting Eng'rs v. Smith*, 643 P.2d 1156, 1159 (Kan. App. 1982) (noting that a principal's words or actions suggesting that an agent has authority are

-14-

sometimes "overt and explicit," but that "[i]n other cases, the mere relationship between the agent and principal or the title conferred upon the agent by the principal is sufficient to constitute a representation of some authority").  Indeed, Digital's corporate bylaws explicitly stated:  "Except as otherwise required by law or by these Bylaws, any contract or other instrument may be executed and delivered in the name of the Corporation and on its behalf by . . . any Vice President."  (Appellant's App. at 1464.)  Thus, under Digital's own bylaws, Vice President Haler was explicitly vested with authority to execute contracts.  Second, Digital indicated by both word and deed that Vice President Haler had validly exercised his contract-signing authority in November 2008 when he signed the 2008 contract on behalf of Digital.  Digital has never contested the fact that Vice President Haler was fully authorized to enter into this contract, and its actions following the signing of the 2008 contract clearly signaled to $Z^3$ that Vice President Haler was authorized to enter into this type of contract for the design, manufacture, and delivery of circuit board modules.

Despite all of this undisputed evidence, Digital contends Vice President Haler lacked even apparent authority to enter into the 2009 contract because of an internal change to Digital's signature policies (but not the company bylaws) in the intervening month between the signing of the two contracts.  However, there is no evidence that $Z^3$ was ever informed of this internal policy change, and we therefore conclude that this change did not affect Vice President Haler's apparent authority to enter into this type of contract.  *Cf. Homes Sav. Ass'n v. Gen. Electric Credit Corp.*, 708 P.2d 280, 283 (Nev.

-15-

1985) ("HSA, as principal, may be bound by the acts of its agent as to third parties who have no reason to know of the agent's improper conduct."). Digital also argues that a finding of apparent authority could only be premised on evidence that Digital made specific representations to $Z^3$ regarding Vice President Haler's authority to enter into this specific contract. Digital points to no cases suggesting that an objectively reasonable belief in an agent's authority will only arise where the principal makes specific representations about the precise act in question in that case. Indeed, such a rule would vitiate the doctrine of apparent authority. In light of the undisputed evidence regarding Vice President Haler's title, Digital's bylaws, Digital's prior dealings with $Z^3$, and the substantial similarity between the valid 2008 contract and the contested 2009 contract, we are persuaded that $Z^3$'s belief in Vice President Haler's authority to enter into the 2009 contract was objectively reasonable. Nevada law does not require more.

## C. Substantial Performance

Digital next argues that $Z^3$'s breach of contract claim on the 2009 contract is barred by $Z^3$'s failure to substantially perform its own obligations under the contract. Nebraska law generally holds that "[t]o successfully bring an action on a contract, a plaintiff must first establish that the plaintiff substantially performed the plaintiff's obligations under the contract." *VRT, Inc. v. Dutton-Lainson Co.*, 530 N.W.2d 619, 623 (Neb. 1995). "Substantial performance is shown when the following circumstances are established by the evidence: (1) The party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other

-16-

party, and (3) such benefits are retained by the other party." *Id.* Here, because Digital repudiated the contract during the design period, $Z^3$ never completed the modules, and thus Digital did not receive beneficial performance or retain any such benefits. Digital accordingly argues that $Z^3$ cannot recover any damages for Digital's breach. However, the Nebraska Supreme Court has made clear that a party's failure to substantially perform its obligations under the contract will be excused if the party attempted to perform in good faith but was "substantially hindered and obstructed" by the other party. *Brown v. Alron, Inc.*, 388 N.W.2d 67, 71 (Neb. 1986); *see also In re Estate of Weinberger*, 279 N.W.2d 849, 854 (Neb. 1979) ("Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has an option to treat the contract as ended so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach."). The undisputed evidence in this case demonstrates that $Z^3$ attempted to perform its contractual obligations in good faith but was substantially hindered and obstructed by Digital's anticipatory repudiation of the contract. We therefore reject this argument.

**D. $Z^3$'s Lost-Profit Damages under ¶ 14(a) and (b)(i)**

Digital's final argument on appeal is that the district court erred in concluding $Z^3$ could recover lost profits for Digital's failure to make the minimum pre-production and initial production orders under ¶ 14(a) and (b)(i) of the 2009 contract. Specifically, Digital contends $Z^3$ could not recover lost profits because this contract was governed by the Nebraska Uniform Commercial Code, which does not provide for lost profits as a

remedy for breach of a contract for the sale of goods. The fundamental problem with this argument is that the 2009 contract was not a contract for the sale of goods. The 2009 contract explicitly stated it was a licensing agreement under which the modules would be "licensed, not sold to [Digital]," with $Z^3$ retaining "title and ownership." (Appellant's App. at 52.) Accordingly, this contract was not governed by provisions regarding contracts for the sale of goods, and Digital has presented no convincing reason why the district court erred in permitting $Z^3$ to recover lost-profit damages for Digital's failure to purchase the pre-production and initial production orders.

### III. $Z^3$'s cross-appeal

In its cross-appeal, $Z^3$ raises two main issues. First, $Z^3$ contends the district court erred by interpreting ¶ 14(b)(iii) and (iv) as an alternative contract under which Digital could either order a minimum of 36,000 units or pay a minimum total royalty of $270,000. Additionally, $Z^3$ contends that, if these provisions are interpreted as an alternative contract, the district court erred in awarding $Z^3$ the smaller alternative of $270,000 rather than permitting it to recover its lost profits for Digital's alternative obligation to purchase a minimum of 36,000 units. Second, $Z^3$ contends the district court erred in denying its request for prejudgment interest for the $15,000 awarded by the jury on the 2008 contract and for the 2009 contract's $175,000 design fee and $270,000 royalty payment that the district court held $Z^3$ was entitled to on summary judgment. We first consider $Z^3$'s argument regarding the district court's interpretation of ¶ 14(b)(iii) and (iv), then turn to the prejudgment interest issue.

-18-

## A. Interpretation of ¶ 14(b)(iii) and (iv)

We review de novo the district court's interpretation of the 2009 contract and its legal conclusions regarding the applicable state law. *See State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 521 (10th Cir. 1994). The dispute in this case centers around ¶ 14(b)(iv), which follows ¶ 14(b)(iii)'s provisions regarding the 36,000 minimum purchase requirement and provides in part: "If LICEN[S]EE does not order 36,000 units at 12,000 units per year, LICENSEE is [to] pay a minimum royalty to LICENSOR equivalent to 12,000*$7.500 = $90,000 royalty per calendar year or the pro-rated balance if at least some units have been purchased within the fiscal year in question." (Appellant's App. at 63.) The district court concluded this provision established an alternative contract, under which Digital could satisfy its performance obligations by either ordering a total of 36,000 units or paying a total royalty of $270,000. Z[3] argues this conclusion was an incorrect interpretation of the contractual provisions.

We have not found any applicable Nebraska cases dealing with alternative contracts, so we assume Nebraska would follow the general law on this issue. As other authorities have stated, an alternative contract provides that "either one of two performances may be given by the promisor and received by the promisee as the agreed exchange for a return performance by the promisee." *In re Cmty. Med. Ctr.*, 623 F.2d 864, 867 (3d Cir. 1980). One type of alternative contract is a "take-or-pay" contract, under which the buyer can perform its obligations under the contract by either taking the minimum purchase obligation (and paying for the purchase) or instead paying a specified

amount without taking the product. *Prenalta Corp. v. Colo. Interstate Gas Co.*, 944 F.2d 677, 689 (10th Cir. 1991). A take-or-pay provision is thus different from an obligation combined with a liquidated damages provision: the "pay" option of a take-or-pay contract is a valid alternative for the buyer to perform under the contract, rather than a measure of damages for breach of a purchase obligation. *See id.* However, where a buyer breaches a take-or-pay contract, the "pay" option will frequently serve as an appropriate measure of damages, particularly where the contract provides for expiration of the "take" option after a period of time. *Id.*

In determining whether a contract is a true alternative contract, we look not to the form of the transaction but to its substance, and a contract will be construed as an alternative contract if "it appears that it was intended to give a real option, that is, that it was conceived possible that at the time fixed for performance, either alternative might prove the more desirable." 14 Williston on Contracts § 42:10 (4th ed. 2010). Thus, an alternative contract is one in which "either alternative may prove the more advantageous and is as open to the promisor as the other." *Id.*

Based on these authorities, we agree with the district court that ¶ 14(b)(iii) and (iv) set forth an alternative contract which Digital could satisfy either by taking a minimum of 12,000 modules per year or by paying a minimum royalty of $90,000 per year for three years. The surrounding contractual language indicates that the reason for the royalty option was that the parties did not know at the time of contract formation whether $Z^3$ would remain willing to produce the modules or whether Digital would find the price and

quality of Z³'s modules acceptable on an ongoing basis. Our review of the contract thus persuades us that "it was conceived possible that . . . either alternative m[ight] prove the more advantageous." *Id.* As for whether the royalty option was "as open to [Digital] as the [purchase obligation]," *id.*, Z³ contends that ¶ 14(b)(iii) in fact set forth a mandatory purchase obligation, while ¶ 14(b)(iv) only described a consequence of nonperformance of this obligation. However, we are persuaded these provisions in fact gave Digital a choice between alternative performances. While Digital's pre-production and initial production purchase obligations under ¶ 14(a) and ¶ 14(b)(i) were unequivocal in their requirement that Digital purchase a minimum number of pre-production and initial production units, ¶ 14(b)(iii) was entitled "Minimum 12,000 units *or* equivalent Royalty PER YEAR for 3 years," and ¶ 14(b)(iv) set forth the royalty Digital would be required to pay if it chose not to purchase the minimum number of units. (Appellant's App. at 63 (emphasis added).) Indeed, the contract permitted Digital to take some combination of the two performance options, since Digital could purchase some units during a particular year and then pay the prorated balance of the royalty for the units it did not purchase. The pertinent provisions did not indicate that Digital would be found in breach of the contract if it paid the full or prorated royalty in lieu of purchasing modules; rather these provisions simply described the minimum purchase requirement "*or equivalent Royalty*" to which Digital was obligated. (*Id.* (emphasis added).) We agree with the district court that ¶ 14(b)(iii) and (iv) set forth a valid take-or-pay contract under which Digital had the choice of alternatives to fulfill its contractual obligations.

**B. Appropriate Measure of Damages under ¶ 14(b)(iii) and (iv)**

Having so concluded, we must next consider whether the district court erred in limiting Z³'s damages for Digital's breach of these provisions to $270,000 in royalties rather than the larger amount of Z³'s lost profits for Digital's failure to purchase the 36,000 units. Because there is no Nebraska law on point, we must attempt to predict what the Nebraska Supreme Court would do if faced with this issue. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

There is no universal consensus on the question of appropriate damages for breach of an alternative contract. In 1934, a panel of this court held as a matter of federal common law that damages could be based on the alternative that would result in the largest recovery. *Prudential Ins. Co. v. Faulkner*, 68 F.2d 676 (10th Cir. 1934).[3] In reaching this conclusion, the panel majority reasoned that "[o]ne who repudiates his obligation under a contract cannot thereafter exercise an election contained in its provisions." *Id.* at 679. A few cases have followed this rule. *See, e.g.*, *Anderson v. Rexroad*, 306 P.2d 137, 142 (Kan. 1957). However, most cases have instead followed the rule set forth in the First Restatement of Contracts, which provides: "The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery."

---

[3] Of course, in the case before us we are applying Nebraska law, and thus our prior opinion bears only persuasive and not precedential weight.

Restatement (First) of Contracts § 344 (1932); *see In re Cmty. Med. Ctr.*, 623 F.2d at 868 (describing the First Restatement rule as the "general rule" and stating that the *Prudential* approach "has garnered scholarly approval in only one situation—where the contract itself contains language granting the promisee the right to elect remedies"); *see also* 25 Williston on Contracts § 66:106 (4th Ed. 2010) (collecting cases and describing the *Prudential* approach as "an inconsistent and, it seems, erroneous rule . . . laid down in a few cases"). The majority of courts have reasoned, like the dissent in *Prudential*, that the *Prudential* approach "results in the imposing upon the promisor, as a penalty for the breach, a greater obligation or duty than does the contract itself; its effect is to increase the contractual rights of the promisee upon a breach by the promisor when the contract does not so provide, and to make a new contract for the parties." *Prudential*, 68 F.2d at 684 (Phillips, J., dissenting).

In recent years, a few courts have questioned in dicta whether the rule set forth in Section 344 of the First Restatement is still the current rule, in light of the omission of this provision from the Second Restatement. *See, e.g.*, *Schwan-Stabilo Cosmetics GmbH & Co.v. PacificLink Int'l Corp.*, 401 F.3d 28, 34 (2d Cir. 2005) ("Even if this is currently the rule—and its absence from the Second Restatement of Contracts suggests that it is not—it does not appear to apply in a case such as this one."); *Minnick v. Clearwire US LLC*, 275 P.3d 1127 (Wash. 2012) (same). However, these courts have not expressly rejected the First Restatement rule, but have instead premised their holdings on what Williston describes as "[a]n exception to the general rule," which "is made if one of the

alternatives is to pay a certain sum of money." 25 Williston on Contracts § 66:106 (4th Ed. 2010); *see Schwan-Stabilo*, 401 F.3d at 34 (holding that the First Restatement rule was inapplicable based on the exception for cases "where an alternative contract provides as one alternative the payment of a sum of money"); *Minnick*, 275 P.3d at 1135 (same). This exception provides that "[i]n an alternative contract where one of the alternatives is a sum of money, the promisee is entitled to the sum of money even though the other alternative may be less onerous to the promisor." *Minnick*, 275 P.3d at 1135. Thus, courts which have applied this exception have not needed to determine the continued viability of the general First Restatement rule.

We conclude the Nebraska Supreme Court would be most likely to follow the majority approach and award damages based on the alternative that would result in the smaller recovery. This conclusion is bolstered by the fact that the lesser alternative in this case—the $270,000 total royalty payment—is a fixed sum of money under the "pay" alternative of the take-or-pay contract. An award of damages based on this monetary alternative accordingly complies with the approach taken by several courts, including those which have called the First Restatement rule into question, for an alternative contract that provides as one alternative the payment of a fixed sum of money. We therefore affirm the district court's holding that $Z^3$ was only entitled to $270,000 in damages for Digital's breach of its obligation to either purchase 12,000 units or pay a $90,000 royalty each year for three years.

## C. Prejudgment Interest

-24-

We turn then to the final issue we must resolve in these cross-appeals—$Z^3$'s argument that the district court erred in denying its request for prejudgment interest for the $15,000 awarded by the jury on the 2008 contract and for the $175,000 in unpaid design fees and $270,000 in royalties that the district court awarded to $Z^3$ on summary judgment on the 2009 contract.

Before resolving this issue, we must first determine the standard of review that governs our review of the district court's denial of prejudgment interest. $Z^3$ argues we must review this decision under a state de novo standard of review, while Digital argues our review is instead governed by a federal abuse of discretion standard. We note there is some conflict in the cases over whether the appellate standard of review in a federal diversity case is governed by state or by federal law. *Compare Freund v. Nycomed Amersham*, 347 F.3d 752, 762 (9th Cir. 2003) ("Yet it is well established that rules regarding the appropriate standard of review, or even the availability of review at all, to be applied by a federal court sitting in diversity, are questions of federal law."), *and Atlas Food Sys. & Servs. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 596 (4th Cir. 1996) ("While state law governs the substantive right to setoff, federal law dictates our standard of review. And, under federal law, a district court's decision to set off a damage award is reviewed for clear error."), *with United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1233 (10th Cir. 2000) (citing a Colorado case in support of reviewing de novo the district court's conclusion that the facts of a case fell within the terms of Colorado's prejudgment interest statute"), *and Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894

(6th Cir. 1997) ("[B]ecause this is a diversity case, we apply the standard of review used by the courts of the state whose substantive law governs the actions."). However, we need not resolve this issue in the case before us because we conclude that a de novo standard of review is appropriate whether we label it a federal or a state standard.

As Digital notes, several Tenth Circuit cases have indicated that the district court's denial of prejudgment interest is reviewed for abuse of discretion. However, we have elsewhere more aptly stated that "[a]n award of prejudgment interest 'is *generally* subject to an abuse of discretion standard of review on appeal.'" *Atl. Richfield v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1156 (10th Cir. 2000) (quoting *Driver Music Co. v. Commercial Union Ins. Cos.*, 94 F.3d 1428, 1433 (10th Cir. 1996)) (emphasis added). A closer examination of our cases reveals that the abuse of discretion standard is generally appropriate because the decision whether to award prejudgment interest is generally committed to the district court's discretion. Under federal law, an award of prejudgment interest is generally equitable; accordingly, in the "absence of a statutory provision to the contrary, the district court has broad discretion in deciding whether to grant prejudgment interest." *FDIC v. Rocket Oil Co.*, 865 F.2d 1158, 1160 (10th Cir. 1989). When, as is usually the case, the district court has broad discretion on the question of prejudgment interest, the abuse of discretion standard will govern. *Id.* However, we are not persuaded that this general rule requires us to apply an abuse of discretion standard even in cases where a statute—whether federal or state—makes an award of prejudgment interest mandatory rather than discretionary. In such cases, it is appropriate to instead apply a de

-26-

novo review, since the pertinent inquiry in such a case will not involve the district court's exercise of discretion, but will instead involve only the court's legal determination as to whether the facts of the case fall within the terms of the statutory mandate.

The Second Circuit reached the same conclusion in a case involving an award of post-judgment interest. In *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004), the Second Circuit applied a de novo standard of review to review the district court's award of post-judgment interest under 28 U.S.C. § 1961. The court explained:

> We recognize that interest awards are ordinarily said to be subject to an abuse of discretion standard. But such language appears only in cases where the statute commits those awards to the district court's discretion. In contrast, we have not limited review to the abuse of discretion standard in cases where the governing law made an award of interest mandatory.

*Id.* (citations omitted). Our own circuit at least implicitly reached the same conclusion in *United International Holdings*, in which we applied a de novo standard of review to determine whether the facts of the case before us fell within the terms of Colorado's non-discretionary prejudgment interest statute. 210 F.3d at 1233.

The applicable state statute in this case commits no discretion in the district court, providing instead that prejudgment interest "*shall* accrue on the unpaid balance of liquidated claims from the date the cause of action arose until the entry of judgment." Neb. Rev. Stat. § 45-103.02(2) (emphasis added). Because an award of prejudgment interest is mandatory under Nebraska law if the statutory terms are met, we review the district court's denial of prejudgment interest under a de novo standard.

Turning then to the merits of this issue, we note that Nebraska Revised Statutes

Section 45-103.02(2) provides for prejudgment interest only for "liquidated claims." The Nebraska Supreme Court has explained: "Liquidated claims are those where there is no reasonable controversy as to the plaintiff's right to recover or as to the amount of such recovery." *Blue Valley Coop. v. Nat. Farmers Org.*, 600 N.W.2d 786, 796 (Neb. 1999). Thus, to determine whether an award of prejudgement interest should be made, "[a] two-pronged inquiry is required," under which there can be no reasonable controversy "either as to the amount due or as to the plaintiff's right to recover, or both." *Countryside Coop. v. Harry A. Koch, Co.*, 790 N.W.2d 873, 889 (Neb. 2010). We apply this two-pronged inquiry to each of the three sums of money for which $Z^3$ seeks prejudgment interest: (1) the $15,000 awarded by the jury on the 2008 contract; (2) the unpaid $175,000 in design fees the district court held $Z^3$ was entitled to on summary judgment; and (3) the $270,000 royalty payment the district court held $Z^3$ was entitled to based on ¶ 14(b)(iii) and (iv) of the contract.

$Z^3$ contends it is entitled to prejudgment interest on the $15,000 awarded by the jury on the 2008 contract because there was no dispute that Digital breached the contract by failing to make the final, indisputable $15,000 payment due under the contract. However, this argument ignores the controversy in this litigation as to whether $Z^3$ had "substantially performed so that it could . . . recover the balance due" on the 2008 contract. *Lange Indus., Inc. v. Hallam Grain Co.*, 507 N.W.2d 465, 477 (Neb. 1993). Digital contended throughout the proceedings below that the pink noise and other hardware issues with the modules delivered by $Z^3$ demonstrated that $Z^3$ had failed to

-28-

substantially perform its obligations under the contract. Indeed, the jury ultimately agreed with Digital that $Z^3$ had breached the contract by failing to satisfy the hardware warranties, although the jury implicitly found that both sides had substantially performed under the contract such that they were each entitled to recover for the other's breach.

The pertinent facts regarding the $15,000 award in this case are very close to the facts at issue in the controlling Nebraska case of *Church of the Holy Spirit v. Bevco, Inc.* 338 N.W.2d 601 (Neb. 1983). In that case, a church hired a contractor, Bevco, to construct a parish center, and Bevco hired a subcontractor which did a very poor job of painting the parish center's exterior walls. The church sued Bevco for breach of contract based on the "improper exterior wall coating and caulking resulting in lack of uniformity in color, thickness and texture, discoloration, cracking, [and] peeling." *Id.* at 604 (internal quotation marks omitted). In response, Bevco filed a counterclaim against the church seeking the unpaid balance of $16,750 that was due under the contract. The jury ultimately found that both parties had breached the contract, and it awarded $29,117 to the church and $16,750 to Bevco. *Id.* at 605. On appeal, Bevco claimed the trial court erred in denying its request for prejudgment interest on its $16,750 counterclaim. The Nebraska Supreme Court affirmed the trial court's decision. The court explained:

> The poor quality of the painting raised the question whether Bevco could recover any amount from the Church. In view of the faulty painting—a breach of contract—Bevco requested and received an instruction on substantial performance in order to prevail on its counterclaim against the Church. Any possibility of recovery by Bevco depended on the jury's answer to the question, Had Bevco substantially performed its contract with the Church? A reasonable controversy existed regarding the nature and

-29-

degree of performance by Bevco, and, therefore, the claim was not liquidated. The trial court was correct in denying prejudgment interest on Bevco's counterclaim.

*Id.* at 607. The *Bevco* case is on all fours with the case before us. Consequently, $Z^3$'s argument that it is entitled to prejudgment interest for its award of $15,000 on the 2008 contract lacks merit.

We turn then to $Z^3$'s argument that it is entitled to prejudgment interest for the $175,000 in unpaid design fees that the district court held it was entitled to on summary judgment. First, we must decide whether there was a reasonable controversy as to $Z^3$'s right to recover for Digital's breach of the 2009 contract. Digital contends there was a reasonable controversy based on its arguments regarding Vice President Haler's lack of authority to enter into the 2009 contract on behalf of Digital. For the reasons discussed above, we find this argument to be without merit, and we are persuaded the principle of apparent authority was sufficiently settled that there could be no reasonable controversy as to whether Digital was bound by the contract. Moreover, the undisputed facts clearly established that Digital breached the contract through its unequivocal anticipatory repudiation. We accordingly conclude there was no reasonable controversy as to $Z^3$'s right to recover for Digital's breach of the 2009 contract.

The second prong of the inquiry for determining whether a claim is liquidated—whether there is "no reasonable controversy as to . . . the amount of such recovery," *Blue Valley Coop.*, 600 N.W.2d at 796 —requires a somewhat lengthier analysis in this case. To make this determination, the critical question we must resolve is

-30-

whether the "no reasonable controversy" requirement applies to the entire amount of damages due for Digital's breach of the 2009 contract, or whether $Z^3$ can instead recover prejudgment interest for those specific portions of damages (i.e., the unpaid $175,000 in design fees) as to which the amount of recovery was undisputed, even if other elements of damages remained in dispute. Digital contends the total sum of damages recoverable for $Z^3$'s single claim of breach of the 2009 contract needed to be liquidated in order for $Z^3$ to be entitled to prejudgment interest under Nebraska law for any portion of damages. $Z^3$ argues in response that Nebraska law entitles it to recover prejudgment interest for those portions of the damage award where there was no reasonable controversy as to either its right to recover or the amount of such recovery, regardless of whether the entire amount of damages was settled.

After reviewing the pertinent Nebraska cases, we agree with $Z^3$ that it is entitled to recover prejudgment interest for those portions of the damage award as to which both $Z^3$'s right of recovery and the amount to be recovered were not reasonably controverted. The Nebraska Supreme Court has indicated that a single claim of breach can give rise to disparate elements of damages, not all of which need to be liquidated in order for the undisputed amounts to give rise to an award of prejudgment interest. For instance, in *Classen v. Becton, Dickinson & Co.*, 334 N.W.2d 644 (Neb. 1983), the plaintiff agreed to supply steel to the defendant for its construction work, and the defendant agreed to pay a total of approximately $118,500 in return. The plaintiff supplied steel to the defendant, and the defendant paid invoices amounting to $98,094.38. However, the defendant

-31-

refused to pay the final invoice for $20,350.74. When the plaintiff sued to recover this unpaid amount, the defendant filed an answer and a setoff, in which it sought to reduce the plaintiff's recovery by the amount the defendant was allegedly damaged as a result of the plaintiff's late delivery and misfabrication of steel. Because the defendant's alleged damages were smaller than the amount due on the unpaid invoice, "[t]he trial court found that it was agreed by all parties that there was $17,723.94 due the plaintiff." *Id.* at 645. However, based on the defendant's disputed setoff claim, there was a dispute as to whether the plaintiff could recover the remainder of the unpaid invoice amount. The defendant ultimately succeeded in part on its setoff claim, and the plaintiff was awarded a total judgment of $18,973.94. On appeal, the plaintiff contended it was entitled to prejudgment interest on this award based on the defendant's failure to pay the final invoice. The Nebraska Supreme Court agreed with this argument, but only as to the undisputed amount of the award: "The record shows that $17,723.94 of the amount due the plaintiff was not disputed and therefore was a liquidated claim. The plaintiff was entitled to interest on that amount . . . ." *Id.* However, because there was a dispute as to whether the plaintiff could recover the remaining portion of the unpaid invoice, the plaintiff was not entitled to prejudgment interest on the $1,250 it recovered after resolution of the defendant's setoff claim. *Id.* Likewise, in a recent case where the "sole cause of action was essentially an action for conversion," *Brook Valley Ltd. P'ship v. Mut. of Omaha Bank*, 825 N.W.2d 779, 785 (Neb. 2013), the Nebraska Supreme Court similarly upheld an award of prejudgment interest on one portion of the award of

damages despite the fact that there was a reasonable controversy as to the amount due and the right of recovery on another element of damages. *Id.* at 792; *see also Cheloha v. Cheloha*, 582 N.W.2d 291, 295-97, 301 (Neb. 1998) (holding in an action for an accounting that the plaintiff was entitled to prejudgment interest for those elements of damages as to which there was no reasonable controversy, while reversing the trial court's award of prejudgment interest for those elements of damages as to which there was a reasonable controversy).

In this case, there was no reasonable controversy as to whether Digital breached the 2009 contract, nor was there any reasonable dispute that $Z^3$ was entitled to $175,000 in damages based on Digital's failure to pay the remaining $175,000 in fees that were due during the design period. We accordingly hold that $Z^3$ was entitled to prejudgment interest on this $175,000 award.

Finally, we turn to $Z^3$'s argument that it is similarly entitled to prejudgment interest on the $270,000 award the district court held it was entitled to for Digital's breach of ¶ 14(b)(iii) and (iv). Again, as with the $175,000 design-fee award, there was no reasonable controversy that $Z^3$ had a right to recover for Digital's breach of the 2009 contract. Unlike the uncontroverted $175,000 design-fee award, however, $Z^3$'s right to recover a specific amount of damages under ¶ 14(b)(iii) and (iv) was the subject of reasonable controversy. Whereas $Z^3$'s entitlement to the $175,000 award flowed automatically from Digital's repudiation of the valid 2009 contract, $Z^3$'s entitlement to the $270,000 in minimum royalty fees turned on the resolution of the parties' alternative-

-33-

contract arguments.

Specifically, the parties have disputed throughout this case both (1) whether ¶ 14(b)(iii) and (iv) created an alternative take-or-pay contract and, if so, (2) which alternative—lost profits or $270,000 in minimum royalties—was the appropriate remedy in the event of breach. Resolving these two questions could yield three possible outcomes under this provision of the contract. First, if ¶ 14 did not create an alternative contract, then Digital would owe $Z^3$ both lost profits and $270,000 in minimum royalty fees. Second, if ¶ 14 created an alternative contract and if $Z^3$ was entitled to the greater alternative, then Digital would owe $Z^3$ lost-profit damages, but not the $270,000 in minimum royalties. Third, if ¶ 14 created an alternative contract and $Z^3$ was only entitled to the smaller alternative, then Digital would owe $Z^3$ the $270,000 in minimum royalties, but not lost profits.[4]

---

[4] $Z^3$ contends on appeal that its entitlement to $270,000 has always been uncontested because $Z^3$ has consistently maintained that it is entitled to recover both lost profits and the $270,000 in minimum royalty fees, while Digital has consistently maintained that $Z^3$'s potential recovery is limited to the smaller alternative of $270,000. However, $Z^3$'s own arguments on appeal belie this contention. While $Z^3$ mainly focuses on its argument that ¶ 14(b)(iii) and (iv) did not create an alternative contract, it also argues that if we do find an alternative contract, we must permit $Z^3$ to recover the greater alternative of lost profits *instead of* the lesser alternative of $270,000 in royalties. $Z^3$'s filings to the district court also demonstrate continued controversy as to whether $Z^3$ was entitled to recover lost profits, minimum royalties, or both. While $Z^3$ sometimes sought both lost profits and minimum royalties, it sometimes sought only the greater alternative of lost profits. For instance, in its Rule 26(a)(1) disclosures, $Z^3$ disclosed as its damages only the $15,000 non-payment for the 2008 contract, the $175,000 balance due for design fees under the 2009 contract, and $2.3 million in "lost profits on 39,050 DM365 units @ average profit per unit of $60." (Appellant's App. at 361.) Likewise, the district court's pretrial order noted that $Z^3$ sought $4.05 million in damages as detailed in its expert's

As discussed above, we conclude the third possible outcome applies here. However, this conclusion does not remove the issue from the realm of reasonable controversy. Our resolution of this issue depended on our resolution of two legal questions of first impression in Nebraska. If we had resolved these two contested issues by holding that ¶ 14 created an alternative contract and that $Z^3$ was entitled to recover the greater alternative of lost profits, $Z^3$ could not have recovered prejudgment interest under ¶ 14(b)(iii) and (iv), since $Z^3$'s lost profits could not be calculated "without reliance upon opinion or discretion." *Hill v. City of Lincoln*, 380 N.W.2d 296, 299 (Neb. 1986). Because a reasonable controversy existed as to whether $Z^3$ might be entitled to recover only its lost profits and not the minimum royalty fees under ¶ 14(b)(iii) and (iv), it follows that $Z^3$ was not entitled to prejudgment interest on the $270,000 award it ultimately received. Even though the minimum royalty amount itself was specified in the contract and calculable without "reliance upon opinion or discretion," *id.*, the alternative-contracts dispute meant that $Z^3$'s right to recover this amount was not a foregone conclusion. "[N]ot only was the amount technically unliquidated, but owing to the unsettled state of the law, it was uncertain." *Id.*

---

report (*id.* at 1043), and this report based the $4.05 million damage calculation only on the design fees and lost profits, not the $270,000 royalty payment (*id.* at 1591.) We accordingly agree with Digital that "[t]he $270,000 component of $Z^3$'s damages was in 'controversy' at all times[,] and it is $Z^3$ itself that created that controversy." (Appellant's Resp. and Reply Br. at 17.) *See also Ferer v. Aaron & Sons Co.*, 725 N.W.2d 168, 174-75 (Neb. 2006) ("By electing to pursue their litigation for dissenters' rights and refusing to receive the payment of their pro rata share of the sale proceeds, appellants in this case created a reasonable controversy with regard to their right to receive the sale proceeds.").

Based on the continuing controversy over the amount $Z^3$ was entitled to recover in damages for Digital's breach of ¶ 14(b)(iii) and (iv), we conclude that this damage claim was not liquidated. We therefore hold that $Z^3$ is entitled to prejudgment interest only as to the $175,000 award, since this was the only element of damages for which there was no reasonable controversy either as to $Z^3$'s right to recovery or as to the amount to which $Z^3$ was entitled.

## IV.  Conclusion

For the foregoing reasons, we **REVERSE** and **REMAND** for the district court to award prejudgment interest to $Z^3$ on the $175,000 award of damages for the unpaid design fees. All other portions of the district court's judgment are **AFFIRMED**. We **DENY** $Z^3$'s motion to strike portions of Digital's opening brief.